**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JERMAINE FELCIANO,          :
    *Plaintiff*,            :
                          :
       v.                :     Civil No. 3:18-CV-1932 (OAW)
                          :
TOWN OF EAST HARTFORD, ET AL*,*  :
    *Defendants.*         :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jermaine Feliciano ("Mr. Feliciano" or "Plaintiff") brings this action against the Town of East Hartford ("the town" or "the municipality"), Officers Jared Richards, Lisa Larocque, Adam Aborn, Robert "Scott" Jones, David Choquette, and Todd Mona (all "Officer" followed by their respective surnames), Lieutenants Christopher Connelly, Michael DeMaine, Todd Hanlon, and Javier Rosario (all "Lt." followed by their respective surnames), Sergeants Steven Camp, and Craig Browning (both "Sgt." followed by their respective surnames), Deputy Chiefs Robert Davis, Jr., and Mack Hawkins (both "Dep. Chief" followed by their respective surnames), and Chief of Police Scott M. Sansom ("Chief Sansom") (all Lt., Sgt., Dep. Chief, and Chief Defendants collectively "Supervisory Defendants").  Mr. Feliciano raises various federal and state claims stemming from his arrest on November 28, 2016.

The supervisory defendants and the municipality have moved for summary judgment on the ground that the undisputed facts do not give rise to actionable claims against them.  For the reasons stated herein, the defendants' Motion, ECF No. 100, is **<u>GRANTED IN PART AND DENIED IN PART</u>**.

1

## I.    FACTS

The following facts are taken primarily from the parties' Local Rule 56(a) Statements of Fact.  *See* Defendants' L.R. 56(a)(1) Statement., ECF No. 100-2 ("Def. Stmt."); Plaintiff's L.R. 56(a)(2)(i) Statement., ECF No. 102 ("Pl. Stmt."); and Plaintiff's L.R. 56(a)(2)(ii) Statement. of Additional Facts, ECF No. 102 at 14—36 ("Pl. Addl. Stmt."). All ambiguities in the record are construed in Plaintiff's favor.  All facts are undisputed, unless indicated otherwise:

Chief Sansom began serving in his role as Chief of Police for the EHPD in 2014. ECF No. 100-2 ¶ 36.  Plaintiff states that "Chief Sansom's responsibilities include reviewing and approving policies of the East Hartford Police Department."  Pl. Addl. Stmt., ECF No. 102 ¶ 96.

On November 28, 2016, Officers Richards and Choquette were dispatched to an apartment on Silver Lane, in East Hartford, Connecticut, in response to a complaint of a dispute.[1]  Def. Stmt., ECF No. 100-2 ¶ 1.  Upon the officers' arrival, they observed Plaintiff who ran from them.  *Id.*[2]  According to Plaintiff, while arresting[3] him on that date, Officers Richards and Choquette subjected him to excessive force, and failed to intervene in order to prevent the use of such force.  *Id.* ¶ 2.  He also claims Defendants Richards, Choquette, Larocque, Aborn, Jones, Mona, DeMaine, and Connelly denied him medical attention during his time at the East Hartford Police Department ("EHPD").  *Id.* ¶ 3.  None of the Supervisory Defendants were named in the excessive force or failure to intervene counts,

---

[1] While Defendants identify this as a "domestic" dispute, Plaintiff states the report involved a "verbal" dispute.  Pl. Stmt., ECF No. 102 ¶ 1.

[2] Defendants assert that he ran "from the apartment, down some stairs, and around the corner of the building," ECF No. 100-2 ¶ 1, while Plaintiff states that he encountered the officers and thereupon "exited the hallway through an adjacent stairwell and ran outside the building."  ECF No. 102 ¶ 1.

[3] Plaintiff notes that all charges stemming from his arrest on November 28, 2016, subsequently were dismissed.  Pl. Addl. Stmt., ECF No. 102 ¶ 1.

and Lts. DeMaine and Connelly were the only supervisors named in the claim for denial of medical attention as they were the only supervisory defendants present at the EHPD at the time. *Id.* ¶¶ 4, 5. The parties agree that none of the supervisory defendants were present during Plaintiff's arrest. *Id.* ¶ 4.

In his Statement of Additional Facts, Plaintiff claims to have been "beaten by Officers Richards and Choquette after he was placed in handcuffs," ECF No. 102 ¶ 4, to have expressed (in lock up at the EHPD) that he was in pain, *id.* ¶¶ 5, 8—10, 12—13, 15, 31, 33, and to have requested medical attention, *id.* ¶¶ 8, 11—13, 15, 26, 31, 33. According to Plaintiff, he required assistance to sit upright and to change his clothing, *id.* ¶¶ 5—6, had trouble walking and standing upright for a booking photo, *id.* ¶ 17, and spit blood on the cell floor, *id.* ¶¶ 19—20, 23—25.[4]

Plaintiff further highlights Lt. Connelly's testimony that on the morning at issue, Officer Jones was responsible for the "face-to-face check"[5] of Mr. Feliciano and that Lt. Connelly instructed Officer Jones to do so (in order to determine if Plaintiff had any injuries prior to his transport to court). *Id.* ¶¶ 42—45 (citing Connolly Dep., ECF No. 103, Ex. 3 at 40, 48, 49, 50). Lt. Connelly testified that he instructed Officer Jones regarding methods for checking for injury, *id.* ¶ 46 (citing ECF No. 103, Ex. 3 at 46), after which Officer Jones proceeded to Plaintiff's cell. *Id.* ¶ 47 (citing Feliciano Aff., ECF No. 103, Ex.

---

[4] Plaintiff cites Officer Aborn's deposition testimony that he saw blood on the floor of Plaintiff's cell and Officer Aborn recalled Plaintiff complaining of pain in his ribs. *Id.* ¶ 33 (citing Aborn Dep., ECF No. 103, Ex. 6 at 55, 57).

[5] Plaintiff states that at the time of his arrest, the policy in place provided that "'[a] physical face-to-face check by the Desk Supervisor or his designee of each prisoner shall occur at least once every work shift, and documented on the Prisoner Log.'" *Id.* ¶ 34 (citing East Hartford Police Department General Order 221.10.00 ("Gen. Ord. 221"), ECF No. 103, Ex. 7 at § .11.42). Plaintiff avers that the prescribed protocols were not generally followed, *id.* ¶ 35 (citing ECF No. 103, Ex. 3 at 38, 41), and that the policy further required that if a prisoner requested medical attention, or an officer observed a need for such care, it was supposed to be provided. *Id.* ¶¶ 38—39 (citing ECF No. 103, Ex. 3 at 44—47).

2 ¶ 48; Cell Video, ECF No. 103, Ex. 4 at 09:00:16).  Plaintiff notes he complained to Officer Jones of being in pain, requested that he be transported to the hospital, and states that blood was "clearly visible" on the cell floor.  *Id.* ¶¶ 47—48 (citing ECF No. 103 at 110; ECF No. 103, Ex. 4 at 09:00:38 to 09:02:00).

Jones thereafter purportedly assisted Plaintiff into a transport van to court, *id.* ¶ 50 (citing ECF No. 103, Ex. 2 ¶ 51; ECF No. 103, Ex. 4 at 09:03 to 09:04:20), but upon Plaintiff's complaints of pain and injury to court marshals, he was returned to the EHPD to be transported to the hospital.  *Id.* ¶ 56—57 (citing ECF No. 103, Ex. 2 ¶¶ 57, 58; ECF No. 103, Ex. 3 at 62—63).  Plaintiff notes that at Manchester Hospital "he was diagnosed with six fractured ribs, [a] pulmonary contusion, and [a] punctured lung."  *Id.* ¶ 57. According to Plaintiff, he was subsequently transferred (by ambulance) to Hartford Hospital where he remained for three weeks and underwent several surgical procedures. *Id.* ¶¶ 57—58.

East Hartford police officers are required to complete municipal or state-equivalent training and state-certification training.  ECF No. 100-2 ¶¶ 16—17.  The parties dispute the content of the training, *Id.* ¶ 17; ECF No. 102 ¶ 17[6], but agree that Defendants completed all required training, and re-certification requirements.  ECF No. 100-2 ¶¶ 18—20; ECF No. 102 ¶¶ 18—20.  Michael Lizotte ("Sgt. Lizotte") "is a Sergeant with the East Hartford Police Department, and training supervisor within the Training facility."  ECF No. 100-2 ¶ 29.  He "has access to training files, and is familiar with the training requirements of East Hartford police officers."  *Id.* ¶ 30.

---

[6] Plaintiff's Statement of Additional Facts cites the EHPD's failure to follow regulations regarding medical needs of detainees, its failure to properly train officers regarding such needs, ECF No. 102 at 25—28, ¶¶ 61—70, 73, and a lack of sufficient guidance in the provisions themselves. *Id.* 72—73. Additionally, Plaintiff cites officer deposition testimony regarding the lack of proper training. *Id.* ¶¶ 70, 72, 74.

Defendants state that "[i]n June 2017, Joshua Litwin was the Executive Officer, Office of Chief of Police," and he prepared charts "reflecting all discipline files and internal affairs files for defendants" up to June 20, 2017, and "internal affairs/citizen complaints from the last 10 years alleging unlawful arrest, excessive force, and failure to provide medical attention.. . . ." *Id.* ¶¶ 31—34; ECF No. 102 ¶ 33—34.[7]  At the time he prepared the charts, Mr. Litwin "had full access to all internal affairs, citizen complaints, and discipline files that were on file."  ECF No. 100-2 ¶ 35.

Prior to Plaintiff's arrest, "there were no prior documented complaints of excessive force against Officer Jared Richards or Officer David Choquette," nor "complaints of denial of medical attention against [the Officer Defendants and Lts. DeMaine and Connolly]."  *Id.* ¶¶ 21—22.  From approximately February 2020 through October 2021, "four officers [were] terminated following internal investigations with negative officer outcomes."  *Id.* ¶ 24.

 Plaintiff cites the EHPD's repeated failure to conduct adequate investigations and to impose appropriate discipline, practices that were not in line with applicable policies and did not apply a correct and consistent standard of review, and a lack of proper guidance and training with respect to detainees' medical needs.  ECF No. 102 ¶¶ 75—87.  Plaintiff notes that with respect to the ten years prior to his arrest, of "71 citizen complaints or other investigations within the East Hartford Police Department alleging excessive force or failure to provide medical attention," there was only one finding sustaining a claim,  and only 9 complaints underwent formal internal affairs investigations.

---

[7] Plaintiff clarifies that the first chart reflects such discipline files up to the date it was authored (not "all" files as stated) and the second chart reflects information for the period from 2007—June 20, 2017.  ECF No. 102 ¶¶ 33—34.

*Id.* ¶¶ 88, 91(citing Citizen Complaints, ECF No. 103-3, Ex. 19).  Plaintiff states that the EHPD "purged" a number of complaint files; some despite counsel's notice to preserve evidence with respect to Plaintiff's claims in this case.  *Id.* ¶ 89.

Plaintiff cites evidence that during an internal affairs investigation with respect to his claims, Officer Browning interviewed three prisoners who were in cells adjacent to Plaintiff's at the EHPD and those prisoners stated that the "plaintiff was moaning in pain and had requested medical care from the on-duty Officers."  *Id.* ¶¶ 98—99 (citing ECF No. 103-4 ¶¶ 34, 36, 44).

According to Plaintiff's expert, Captain Ashley Heiberger ("Capt. Heiberger"), the existence of inadequate investigations at the EHPD "contributes to an atmosphere in which officers can feel empowered to engage in dubious conduct because they have seen how unlikely it is that they will be thoroughly investigated, much less held accountable."  ECF No. 100-2 ¶ 6.[8]  Defendants point out that Capt. Heiberger found inadequacies based "in part" on the fact that some interviews were not recorded and that he characterizes the EHPD internal affairs process "as having 'deficiencies and irregularities,'" but that not all investigations were improper.  *Id.*¶¶ 7—9.  Plaintiff objects and notes that Defendants' statement of fact "minimizes the widespread pattern of failure to conduct adequate investigations" at the EHPD and that the statement "omits significant facts."  ECF No. 102 ¶¶ 7—9.[9]  Finally, Defendants state that although "Plaintiff's expert

---

[8] In the first portion of his Report, Capt. Heiberger states his qualifications to testify as an expert in this case and the methodology used.  Heiberger Report, ECF No. 103-1, Ex. 9 at 2—5.  Defendants note, however, that in his review of the complaint files against the EHPD, Captain Heiberger did not review filings from 1995—2007.  ECF No. 100-1 at 16.

[9] Plaintiff notes Capt. Heiberger's findings and conclusions regarding "a pattern of failure to conduct internal affairs investigations of complaints of excessive force . . . ."  *Id.* ¶ 93.  Specifically, Plaintiff's expert found significant concerns and inadequacies in 22 [IA files] including but not limited to: interview of witnesses not being recorded; investigators hold the same or lower rank as the officers being investigated; repeated failures to conduct interview or obtain written statements from

could testify as to any widespread pattern or practice of inadequate investigations[,] [he] could not opine if there was a pattern that cultivated any misconduct." ECF No. 100-2 ¶¶ 13—14. Plaintiff disputes Defendants' statements and for his part refers to his expert's report and conclusions. ECF No. 102 ¶¶ 13—14.[10] He says the EHPD has "a quasi-military hierarchical structure where lower ranking officers are required to obey the orders of superior ranking officers." P. Addl. Stmt., ECF No. 102 ¶ 97.

## II.  LEGAL STANDARD

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d

---

the subject officers; repeated instances where an improper standard of whether the officer "intended" to violate policy being applied; failure to fully investigate or obtain adequate explanations of officers' uses of force; repeated failures to develop factual evidence to support the conclusions; failures to address discrepancies in the evidence.

*Id.* ¶ 95 (citing Heiberger Report, ECF No. 103-1, Ex. 9 at 49-54).

[10] Specifically, Capt. Heiberger concluded that

[b]ased on the agency's own documents, it is clear that the majority of complaints, including those alleging excessive force, are not consistently or appropriately investigated. These lapses contribute to an atmosphere in which officers can feel empowered to engage in dubious conduct because they have seen how unlikely it is that they will be thoroughly investigated, much less held accountable.

*Id.* (citing ECF No. 103-1, Ex. 9 at 56).

Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."  *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986)).  Instead, the party opposing summary judgment must set forth in their response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 243.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At the summary judgment stage, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact for trial.  *Anderson.*, 477 U.S. 242, 249 (1986).  Substantive law will identify which facts are material, and only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment.  *Id.* at 248.

## III.     DISCUSSION

### A. Supervisory Liability

Count Four[11] seeks relief against Lts. DeMaine, Connelly, Hanlon, and Rosario, Sgts. Camp and Browning, Dep. Chiefs Davis and Hawkins, and Chief Sansom, based on a theory of supervisory liability, because either they were on duty during the events at issue (Lts. DeMaine and Connelly), or they were in a supervisory role regarding the Internal Affairs ("IA") investigation of those events (Lts. Hanlon and Rosario, Sgts. Camp and Browning, Dep. Chiefs Davis and Hawkins, and Chief Sansom).  ECF No. 100-1 at 8.  The supervisory defendants argue that Plaintiff has failed to submit evidence of their personal involvement sufficient to support the claims against them.  *Id.* at 10.

However, Plaintiff argues that the supervisory defendants fail to address the relevant legal standard, and that he has presented evidence of an issue of material fact for trial.  ECF No. 101 at ¶¶ 13, 21.  Specifically, he avers that he provides evidence that the supervisory defendants knew of his complaints but "failed to conduct a fair, impartial, unbiased and truth-seeking investigation" into them, and "[i]nstead . . . collaborated, conspired and acted in concert to cover up the wrongdoing . . . in order to avoid discipline themselves, in order to avoid imposing discipline upon any of the officer[s] involved in wrongdoing, and to attempt to avoid any future criminal or civil legal liabilities or penalties." *Id.* at ¶ 21.

The supervisory defendants reply that the claims against them, except the claims in Count Two (for denial of medical attention) directly against Lts. DeMaine and Connelly, "are based solely on their status as supervisors."  ECF No. 104 at 2.  Defendants assert

---

[11] The "Count Three" heading is repeated in the Second Amended Complaint ("SAC"), ECF No. 46; thus, the court will refer to the second one (supervisory liability) as the fourth count.

that Plaintiff must show their direct action or involvement in the violation of Plaintiff's rights and that he has failed to do so. *Id.* at 3—4. With respect to Plaintiff's claim of inadequate investigation into his violated rights, Defendants aver that any such failure occurred "after" those alleged violations and that "[t]his is a policy and practice claim properly analyzed under Monell, and not applicable under the Tangreti standard." *Id.* at 5.

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be "held liable based on a lesser showing of culpability than the constitutional violation requires . . . ." *Tangreti v. Bachmann*, 983 F.3d 609, 617 (2d Cir. 2020) (citing *Iqbal*, 556 U.S. 677). In Tangreti, the United States Court of Appeals for the Second Circuit noted that "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676); *see Staten v. Semple*, 2021 WL 1060225, at *20 (D. Conn. Mar. 19, 2021). The plaintiff must establish that the supervisory defendant "actively participated in a constitutional violation." *Peck v. Cnty. of Onondaga, New York*, 2021 WL 3710546, at *10 (N.D.N.Y. Aug. 20, 2021), *reconsideration denied*, 563 F. Supp. 3d 18 (N.D.N.Y. 2021) (citing *Tangreti*, 983 F.3d at 618). This court has recognized that "imposing liability for a [d]efendant's role in creating or perpetuating an unconstitutional policy is not necessarily inconsistent with Tangreti . . . so long as the defendant's actions – not those of her subordinates – afford a basis." *Harnage v. Dzurenda*, 2022 WL 972438, at *8 (D. Conn. Mar. 31, 2022). "The focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than

10

the *mens rea* required of anyone else.'" *Tangreti*, 983 F.3d at 618) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)).

"'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 617 (quoting *Iqbal*, 556 U.S. at 676). Here, the underlying constitutional violations allege excessive force during arrest, denial of medical care, and the failure to intervene (as to each).[12] Because "there is no special rule for supervisory liability," *Tangreti*, 983 F.3d at 618, the court must assess the legal requirements for those underlying claims in order to determine whether Plaintiff has provided sufficient evidence that each supervisor "through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676).

### i.   *Excessive Force During Arrest*

With respect to a claim for excessive use of force during an arrest, "courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or

---

[12] To the extent Plaintiff also purports to assert an independent claim for failure to properly investigate his claims, such a claim "must fail, as a private citizen has no 'constitutional right to an investigation of any kind by government officials.'" *Stewart v. Ayala*, 3:20-CV-1938 (CSH), 2022 WL 4356467, at *15 (D. Conn. Sept. 20, 2022) (quoting *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted)) (citing *Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (holding that inmates alleging beating by prison guards lacked standing to challenge prison officials' request that magistrate not issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *see also Brown v. Annucci*, 2021 WL 860189, at *6 (S.D.N.Y. Mar. 8, 2021) ("'It is well-settled that failure to investigate alleged unconstitutional action does not state a claim under Section 1983.'" (quoting *Wingate v. Horn*, 2007 WL 30100, at *6 (S.D.N.Y. Jan. 4, 2007), *aff'd*, 2009 WL 320182 (2d Cir. Feb. 10, 2009)); *Jeanty v. City of Utica*, 2021 WL 149051, at *32—33 (N.D.N.Y. Jan. 14, 2021) (noting repeated failure to investigate claims of unconstitutional behavior may support municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978), but dismissing claim alleging supervisor was liable for failure to investigate in violation of police department's policies), *adhered to on reconsideration sub nom.*, 2021 WL 2525061 (N.D.N.Y. Apr. 15, 2021), *aff'd sub nom.*, 2023 WL 325012 (2d Cir. Jan. 20, 2023). *But see Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (recognizing a claim for failure to conduct a proper investigation in the context of alleged retaliation).

motivation.'"  *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)).  In the context of supervisory liability, courts have dismissed such claims where there was no evidence that the supervisor ordered the arresting officers to use excessive force, nor that the supervisor was aware those officers might use such force.  *See Belton v. Wydra*, 2019 WL 2162718, at *11 (D. Conn. May 17, 2019); *Davis v. Cheverko*, 2017 WL 6397749, at *5 (S.D.N.Y. Dec. 13, 2017).

The parties do not dispute that none of the supervisory defendants was present during Plaintiff's arrest and the alleged excessive use of force.  ECF No. 100-2 ¶ 4.  Nor is there any evidence that these defendants directed the alleged use of force.  It is undisputed that "there were no prior documented complaints of excessive force against [Arresting Officers] . . . Richards . . . or . . . Choquette."  ECF No. 100-2 ¶ 21.

Plaintiff relies on evidence of communications by Sgts. Camp and Hanlon (to subordinate officers) made in an effort to "cover up" the incident.  ECF No. 101 at 22. Specifically, Plaintiff cites a message Sgt. Camp sent to all officers of the EHPD after the Plaintiff's arrest and hospitalization, and after Plaintiff made reference to his injuries on Facebook.  In the message, Sgt. Camp stated "[a]s far as I know, Feliciano caused these injuries to himself when he tumbled from a steep embankment into the wilderness below." *Id.* at 23.  Plaintiff cites a similar statement by Lt. Hanlon, indicating his belief that Plaintiff's injuries were "self-inflicted."  *Id.*[13]  With respect to Sgt. Browning, Lt. Rosario,

---

[13] Plaintiff avers Sgt. Hanlon directed his subordinate officers, via email, "to create new documentation in order to cover up the defendants' wrongdoing," and that Sgt. Hanlon specifically stated that the documentation was for the purpose of "defending ourselves if Feliciano file[s] a use of force complaint at a later time."  *Id.* at 24.  However, in support of this statement regarding Sgt. Hanlon's email, Plaintiff cites only the allegations of the complaint.  *Id.*  Additional evidence of the email is contained in the EHPD Investigative Report, ECF No. 103-4, in which the investigating officer, Sgt. Browning, reports that Sgt. Hanlon sent the email to suggest that the arresting officers "write supplemental reports about their knowledge and involvement with Mr. Feliciano's arrest."  *Id.* at 17 ¶ 33.

and Dep. Chiefs Davis and Hawkins, Plaintiff relies on the adequacy of the investigation into officer misconduct.  ECF No. 101 at 25—27.  Sgt. Browning was in charge of the investigation into Plaintiff's allegations, and Plaintiff states he committed "a litany of specific acts or omissions . . . in relation to the internal affairs investigation."  *Id.* at 25. According to Plaintiff, Lt. Rosario and Dep. Chief Davis "participated in the cover-up," and "failed to . . . remedy the wrongs of [subordinate officers]."  *Id.* at 26.

Plaintiff repeatedly argues that a jury could find that the defendants' conduct "amounts to 'failure to remedy the alleged wrong after learning of it, … or gross negligence in managing subordinates.'"  ECF No. 101 at 23, 24, 26, 27 (citing *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)).   However, after *Tangreti*, courts have recognized that these "two theories . . . invoke pre-*Tangreti* principles of supervisory liability that did not survive *Tangreti*."  *Kistner v. City of Buffalo*, 2022 WL 16797986, at *6 (W.D.N.Y. Nov. 8, 2022) (citing *Tangreti*, 983 F.3d at 616), *reconsideration denied*, 2023 WL 21219 (W.D.N.Y. Jan. 3, 2023).  Consequently, "[t]he supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation . . . [and] must personally display the requisite state of mind, depending on the violation at issue." *Sullivan v. City of Glens Falls*, 2022 WL 2390242, at *10 (N.D.N.Y. July 1, 2022) (citing *Tangreti*, 983 F.3d at 618), *report and recommendation adopted*, 2022 WL 4364026 (N.D.N.Y. Sept. 21, 2022).

Plaintiff provides insufficient evidence of the supervisory defendants' personal action to support his excessive force claim against them.  The cited messages and allegations of a "coverup", combined with the purported deficiencies in the investigation, fail to show the requisite level of personal involvement in the excessive force alleged.

Such after-the-fact conduct would not allow a jury reasonably to conclude that the supervisory defendants had sufficient mens rea and direct involvement in the force used.

Additionally, allegations of insufficient investigation go to whether the EHPD had a policy or custom to adequately investigate unconstitutional conduct.  Assuming *Tangreti* provides a basis for supervisory liability for "creating or perpetuating an unconstitutional policy . . . ," *Harnage*, 2022 WL 972438, at *8[14], Lts. Hanlon and Rosario, Sgts. Camp and Browning, Dep. Chief Davis and Lts. DeMaine and Connelly[15] are not alleged to have had policy-making authority.  Although Chief Sansom and Dep. Chief Hawkins, as Chief of Police and Acting Chief of Police, respectively, are alleged to have had policy-making authority for the EHPD,  ECF No. 46 ¶¶ 164—65; *see also* Investigative Report of Incident, ECF No. 103-4 at 38 (Dep. Chief Hawkins signed as "Acting Chief of Police"), Plaintiff solely relies on their respective supervisory positions in support of the claims against them in Count Four.  "'Even before Tangreti, courts recognized that 'mere 'linkage in the prison chain of command' is insufficient to implicate a [supervisor] . . . in a § 1983 claim.'" *Neira v. Cnty. of Nassau*, 2022 WL 4586045, at *14 (E.D.N.Y. Sept. 29, 2022) (quoting *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

Plaintiff presents insufficient evidence upon which a jury could conclude that the supervisory defendants' "'own individual actions," *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676), violated Mr. Feliciano's constitutional right to be free from

---

[14] *See also Stone #1 v. Annucci*, 2021 WL 4463033, at *9 (S.D.N.Y. Sept. 28, 2021) ("the principle that policymakers can still be liable under Section 1983 after *Iqbal* is consistent with the case law, including post-*Tangreti* district court decisions and the decisions of other Courts of Appeals.").

[15] Plaintiff does not cite any evidence in support of the requisite personal involvement of Lts. DeMaine and Connelly in the alleged excessive use of force.  The allegations and evidence as to these defendants is based on their role in the alleged denial of medical care to Plaintiff (addressed *supra* in section A.(ii)).

excessive of force.  *See Neira*, 2022 WL 4586045, at *14 (concluding that evidence of supervisor's knowledge of "inadequate medical care and inmate suicides" coupled with supervisory status insufficient "to demonstrate that Sheriff . . . knew of and disregarded an excessive risk to plaintiff's health or safety").  Accordingly, the Motion for Summary Judgment with respect to the supervisory liability claim (premised on excessive force) against Lts. Hanlon, Rosario, DeMaine and Connelly, Sgts. Camp and Browning, Dep. Chiefs Davis and Hawkins, and Chief Sansom is **GRANTED.**

ii.     *Denial of Adequate Medical Care*

Plaintiff's claim for denial of medical care is analyzed pursuant to the Fourteenth Amendment because at the time of the alleged deprivation he was a pretrial detainee and "'[had] not been convicted of a crime and thus may not be punished in any manner— neither cruelly and unusually nor otherwise.'"  *Ibbison v. Quiros*, 3:22-CV-01163 (SVN), 2023 WL 1766440, at *11 (D. Conn. Feb. 3, 2023) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (internal quotation marks omitted)).  Because "[a] pretrial detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner[,]'" *id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)), in order to prevail on a claim for denial of medical care, a pre-trial detainee must demonstrate proof of deliberate indifference by satisfying both objective and subjective requirements.  *Darnell*, 849 F.3d at 29.  The objective prong requires proof that "the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process."  *Id.*  Objectively, the deprivation is sufficiently serious "when . . . the prisoner was 'actually deprived of adequate medical care,' . . . and (b) 'the inadequacy in

medical care is sufficiently serious.'"  *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)).

The subjective, or "*mens rea* prong" requires a "showing that the officer acted with at least deliberate indifference to the challenged conditions."  *Id.*  The Second Circuit has acknowledged that "[t]he reason that the term 'subjective prong' might be a misleading description is that . . . the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994)).

It is undisputed that the only supervisory defendants on duty at the time of Plaintiff's detention and alleged denial of medical care were Lts. DeMaine and Connelly.  ECF No. 100-2 ¶ 5.  Defendants correctly note that Plaintiff makes independent claims against these defendants in Count Two.  ECF No. 100-1 at 8.  Therefore, the claim premised on supervisory liability against DeMaine and Connelly in Count Four "'is clearly duplicative . . . [as] the direct claim . . . is proceeding against [them] for that action.'"  *Pateman v. City of White Plains*, 2020 WL 1497054, at *23 (S.D.N.Y. Mar. 25, 2020) (quoting *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 394 (S.D.N.Y. 2013) (citing *Burch v. City of New York*, 2016 WL 11430773, at *16 (E.D.N.Y. Apr. 22, 2016) ("[Plaintiff] may not assert a second set of identical claims premised on the same conduct under the label 'supervisory liability.'")))  Therefore, the defendants' Motion for Summary Judgment is **<u>GRANTED</u>** with respect to the claims against Lts. DeMaine and Connolly in Count Four (based on denial of medical care).

With respect to the remaining supervisory defendants, similar to the claims for excessive force, Plaintiff has failed to cite sufficient evidence to create a material issue of fact for trial on his claim for denial of medical care.

Assuming that Plaintiff has satisfied the objective analysis, and was subject to a sufficiently serious deprivation of medical care, there is a lack of evidence that the supervisory defendants had direct participation in that denial of care and that their conduct demonstrates the requisite mens rea.   Again, allegations of a purported "coverup", evidenced by messages to subordinate officers that Plaintiff's injuries were self-inflicted, as well as allegations surrounding the investigation into his claims, are insufficient to demonstrate the requisite conduct of these defendants in connection with their supervisory liability for the alleged deprivation of care.   The allegations regarding this after-the-fact conduct fail to state sufficient evidence such that a jury could conclude that the named supervisors had sufficient mens rea and direct involvement to warrant a claim of an unconstitutional denial of medical care against them.   *See Brown v. Dep't of Corr.*, 2021 WL 124417, at *17—18, 19 (D. Conn. Jan. 13, 2021) (concluding that warden's signature affirming denial of grievance insufficient for supervisory liability and rejecting argument that Defendants' failure to follow administrative directives was "tantamount to direct participation" in the claimed deliberate indifference to Plaintiff's medical needs).

Also, the court reiterates that even assuming *Tangreti* provides a basis for supervisory liability for "creating or perpetuating an unconstitutional policy", *Harnage*, 2022 WL 972438, at *8, Lts. Hanlon and Rosario, Sgts. Camp and Browning, and Dep. Chief Davis are not alleged to have had policymaking authority.   Even the claims as to the defendants alleged to have had such authority (Dep. Chief Hawkins and Chief

## B.    Municipal Liability

Defendants next argue that Count Five,[16] alleging municipal liability, fails pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978).  ECF No. 100-1 at 11. Specifically, Defendants argue that Plaintiff fails to cite sufficient evidence of the requisite widespread policy or custom, "much less that this 'atmosphere' somehow caused or was the 'affirmative link' of alleged excessive force, failure to intervene, and failure to provide medical attention," *id.* at 12—13, sufficient to create an issue for trial.

Plaintiff counters that he "has identified a widespread pattern and practice spanning the ten years prior to his arrest," and he specifically relies on the findings in his expert's report.  ECF No. 101 at 28—30.

"[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. at 690–91).  "'[A] municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*,' *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury,' *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted)."  *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020).

The requisite "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51,

---

[16] As previously noted, *supra* n.11, the SAC mistakenly repeats the "Count Three" heading; thus, the court will refer to the municipal liability claim as Count Five.

61 (2011).  Thus, "if a practice is 'so persistent and widespread as to practically have the force of law,' . . . actual notice by the policymakers need not be proven." *Lucente*, 980 F.3d at 306 (quoting *Connick*, 563 U.S. at 61).  The Second Circuit has recognized that "[s]uch a policy 'may be pronounced or tacit and reflected in either action or inaction.'" *Id.* at 297 (quoting *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)).  With respect to a municipal defendant's failure to act, a "'policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the [municipality] itself to violate the Constitution.'" *Id.* (quoting *Connick*, 563 U.S. at 61-62) (additional citation and quotation marks omitted).  Therefore, "[a] custom, policy, or usage may also be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Legg v. Ulster Cty.*, 979 F.3d 101, 116 (2d Cir. 2020) (internal citation and quotation marks omitted).

Upon proof of the requisite custom or policy, Plaintiff must establish causation; that the unlawful practice was the cause of the underlying constitutional violation.  *See Lucente*, 980 F.3d at 297.

### i.    Policy or Custom

According to the defendants, although the plaintiff's expert cites "deficiencies and irregularities" such failings are insufficient to establish the requisite municipal policy or custom.  ECF No. 100-1 at 15.  Specifically, Defendants note that Capt. Heiberger's reference to the EHPD's failure to record interviews is not supported by any mandate requiring such recording.  *Id.* at 15—16.  Defendants note that the expert did not review any files from the period between 1995—2007, he "could not even opine if there was a pattern that cultivated any misconduct," *id.* at 16, and, therefore, that the evidence falls

short of the requisite permanent and pervasive policy to support Plaintiff's claim against the municipality, *id.* at 17—18.

Rather than merely identifying "isolated incidents," Plaintiff states that his expert "has identified a widespread pattern and practice spanning the ten years prior to his arrest."  ECF No. 101 at 28.  Specifically, Mr. Feliciano avers that during that decade "there were 71 citizen complaints or other investigations within the East Hartford Police Department alleging excessive force or failure to provide medical attention" and that only one such complaint was sustained.  *Id.*  Significantly, Plaintiff notes that the EHPD did not internally investigate 31 of those cases "beyond a preliminary supervisory review."  *Id.*  Plaintiff states that in 22 of 24 files, "Captain Heiberger found significant concerns and inadequacies."  *Id.* at 29.  Specifically, Plaintiff cites deficiencies,

> including but not limited to: interview of witnesses not being recorded; investigators hold[ing] the same or lower rank as the officers being investigated; repeated failures to conduct interview[s] or obtain written statements from the subject officers; repeated instances where an improper standard of whether the officer 'intended' to violate policy being applied; failure to fully investigate or obtain adequate explanations of officers' uses of force; repeated failures to develop factual evidence to support the conclusions; [and] failures to address discrepancies in the evidence.

*Id.* (citing Heiberger Report, ECF No. 103-1 at 49—54).  According to Plaintiff, Defendants' "cherry pick" a single deficiency in the report and "ignore the myriad other evidence in this case of a widespread pattern and practice of deficient investigations."  *Id.*

In a reply brief, Defendants argue that "[t]he alleged inadequate internal investigations are not the constitutional violations . . . [,] [t]here were no prior complaints about the defendant officers related to the particular constitutional violation[,] and even the expert could not opine that there was a widespread pattern or practice."  ECF No. 104 at 5, 6.  According to Defendants, Plaintiff's evidence shows mere disagreement with the

manner in which investigations were conducted, and he "has failed to prove that an affirmative link exists between his alleged injury . . . and any custom or practice of inadequate investigations." *Id.* at 7.

The Second Circuit has recognized "that inaction may lead to municipal liability for the 'persistent failure to discipline subordinates who violate civil rights' as it can 'give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell.*'" *Lucente*, 980 F.3d at 298 (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).  Further, "[d]eliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated."  *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Dodd v. City of Norwich,* 827 F.2d 1, 4–6 (2d Cir.), *modified on reh'g on other grounds,* 827 F.2d 1, 7 (2d Cir.1987), *cert. denied,* 484 U.S. 1007 (1988)).

Under a theory of municipal inaction and failure to properly investigate and address complaints of excessive force and improper medical care, Plaintiff has provided sufficient evidence to create a material issue of fact for trial with respect to the existence of the requisite policy or custom pursuant to *Monell.*  Specifically, Capt. Heiberger concludes that there was evidence of a consistent practice of not thoroughly investigating claims against officers.  ECF No. 103-1 at 50—56.  He cites specific examples of deficiencies in the investigations.  *Id.*  In particular, he notes interviews that were not recorded, *id.* at 50—52 ¶¶ 1, 3, 8, 9, 11, 15; investigators who were at the same or a lower rank as the officers under investigation, *id.* ¶¶ 1, 4, 8, 9, 10, 11, 13; investigations that lacked

interviews from the accused officers, *id.* at 50—53 ¶¶ 2, 4, 6 (untruthfulness charge), 7, 11, 13, 14, 19, 21; investigations that failed to include witness interviews, *id.* ¶¶ 2, 4, 8, 13, 14, 15, 17, 18, 21, 24 (Plaintiff's Complaint); application of an improper standard ("lack of intent to violate policy"), *id.* ¶¶ 3, 4, 6 (untruthfulness charge), 8, 10, 11, 13, 14, 15, 16, 20; investigations with insufficient explanations of officers' uses of force, *id.* at 51—53 ¶¶ 7, 8, 10, 11, 18; investigations that failed to develop factual evidence to support the conclusions drawn, *id.* ¶¶ 8, 9, 13, 21; and an investigation that failed to address discrepancies in the evidence *id.* at 54 ¶ 26 (Sustained Off-Duty Domestic Dispute).

As an "area of concern," Capt. Heiberger also notes that "[s]ome complaints are designated as 'Reference Numbers' and not assigned as Internal Affairs investigations, sometimes in violation of agency policy." *Id.* at 55. According to his report, there is not a definitive process applied to the reference numbered cases and, citing examples, *id.* at 55—56, Capt. Heiberger concludes that these complaints, involving primarily allegations of improper use of force "were not properly investigated." *Id.* at 55.

Further, although Capt. Heiberger's Report primarily relies on inadequacies in improper use of force investigations,[17] *id.* at 50—54, he also states that "there were nearly 60 Reference Numbers alleging unlawful arrest, excessive force, or a failure to provide medical attention in a ten-year period. Approximately 47 of these Reference Numbers were not subject to Internal Affairs investigations." *Id.* at 57. Of note, the expert specifies that "the agency indicated that information regarding approximately two-thirds of the Internal Affairs investigations and over one-half of the Reference Numbers relating to

---

[17] However, in discussing two of the claimed uses of excessive force, Capt. Heiberger also notes that the desk sergeant "did not view the complainant's swollen eye as a serious injury or as an injury requiring immediate medical attention," ECF No. 60-9 at 52 ¶ 10, and he references a complaint regarding the "[d]enial of [an] asthma pump," *id.* at 54 ¶ 28.

officers involved [in] this case are unavailable because the files have been purged."  *Id.*;
*see* Def. Second Supplemental Response to Production Request, ECF No. 103-5 at 3 ¶
4, 4 ¶ 5.

Considering all of the evidence with which he was presented, the expert concludes,
"Based on the agency's own documents, it is clear that the majority of complaints,
including those alleging excessive force, are not consistently or appropriately
investigated."  ECF No. 103-1 at 57.  "These lapses contribute to an atmosphere in which
officers can feel empowered to engage in dubious conduct because they have seen how
unlikely it is that they will be thoroughly investigated, much less held accountable."  *Id.*

Based on all of these findings and the evidence presented, a jury could reasonably
find that the municipality's practice amounted to a policy that tolerated inadequate
investigations in order to avoid liability.  A reasonable jury could infer, from the repeated
complaints and the failure of the municipal defendants to impose discipline or to conduct
appropriate investigation (as evidenced in Capt. Heiberger's Report), that this conduct
amounts to "deliberate indifference" sufficient to state a policy "'so persistent and
widespread as to practically have the force of law' . . . ."  *Lucente*, 980 F.3d at 306 (quoting
*Connick*, 563 U.S. at 61); *see Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.
1995) (holding that deliberate indifference from an "obvious need" for improved
investigations "may be inferred if the [repeated] complaints are followed by no meaningful
attempt on the part of the municipality to investigate or to forestall further incidents.")
(citing *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir. 1991); *Fiacco v. City
of Rensselaer,* 783 F.2d 319, 328 (2d Cir. 1986) ("[w]hether or not the claims had validity,
the very assertion of a number of such claims put the City on notice that there was a

possibility that its police officers had used excessive force")).[18]   Plaintiff has stated sufficient facts to create an issue for the jury as to the requisite "affirmative link" between the evidence of an official policy of inaction and inadequate investigations (creating a culture in which officers felt they would not be subject to repercussions for such abuses) and the violation of his constitutional rights in this case.   As in *Lucente*, "[i]t is squarely within the province of the jury to decide, in determining municipal liability, what weight this evidence should receive on the issue of a policymaker's actual or constructive notice of the unconstitutional conduct in light of all the evidence in this case."   980 F.3d at 301.

      *ii.*     *Failure to Train*

      With respect to Plaintiff's reliance on a failure to train officers as a basis for his *Monell* claims, the defendants argue that "there is simply no record evidence upon which this claim will prevail."   ECF No. 100-1 at 19.   Specifically, Defendants note a lack of prior complaints against the officers involved.   *Id.*   They aver that all officers are required to undergo training and that the named defendants all successfully completed that training on "all aspects of law enforcement[,]" including topics applicable to the alleged conduct in this case.   *Id.* at 19—20.

      In response, Plaintiff notes that his allegations are based on a lack of training with respect to circumstances under which officers must provide medical care to detainees. ECF No. 101 at 30.   He notes that the generalized officer training to which Defendants refer failed to sufficiently inform officers "regarding when and under what circumstances"

---

[18] *But see Jones v. Town of E. Haven*, 691 F.3d 72, 82, 85 (2d Cir. 2012), *cert. denied*, 571 U.S. 940 (2013) (finding "two instances, or at the most three, over a period of several years" of abusive conduct and "one incident in which an officer indicated a disposition to abuse . . . fell far short of showing a policy, custom, or usage" and noting "[n]or was there evidence that supervisors communicated to officers an attitude of indifference to abuse so as to give the officers a sense of liberty to abuse rights.").

they were required to provide such care.  *Id.*  Plaintiff cites his Statement of Additional Facts, ECF No. 102 at ¶¶ 61—74, and East Hartford Police Department General Order 221.10.00 ("Gen. Ord. 221"), ECF No. 103, Ex. 7, for the proposition that officers were required to assess the detainees' health, to record information regarding their medical status, and to conduct "face-to-face checks" of the detainees, all of which they failed to do in this case.  ECF No. 102 at ¶¶ 65—67.  Plaintiff cites testimony from the officers who were involved in his medical care, indicating their lack of familiarity with these protocols.  *Id.* at ¶¶ 70, 73—74.  Additionally, Plaintiff notes that Gen. Ord. 221 required supervisors to ensure that their personnel were familiar with its provisions and that the policy itself "does not contain any definition, instruction, or guidance as to when or under what circumstances officers should obtain medical attention for detainees."  *Id.* at ¶¶ 71—72.

Defendants reply that Plaintiff fails to offer the requisite evidence linking the purported deficiencies in the Town's training program to the violation of his constitutional rights.  ECF No. 104 at 8.

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton,* 489 U.S. at 388).  When making such a claim, a Plaintiff must demonstrate (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation . . . [; (2)] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . . [; and (3)] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional

rights." *Walker v. City of New York*, 974 F.2d 293, 297—98 (2d Cir. 1992) (quoting *City of Canton,* 489 U.S. at 390); *see Ramos v. Town of E. Hartford*, 2019 WL 2785594, at *15 (D. Conn. July 2, 2019).   Further, a claim based on inadequate training "requires evidence as to the city's training program and the way in which that program contributed to the violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 n.8 (2d Cir. 2004).   In the context of such a claim, "plaintiffs must establish that the officials consciously disregarded a *risk* of future violations of clearly established constitutional rights by badly trained employees." *Id.*  A plaintiff must present evidence regarding "how a hypothetically well-trained officer would have acted under the circumstances." *Id.* at 130 (internal citation and quotation marks omitted).   It is insufficient for the factfinder to make the inference that training was inadequate and that it thus caused the constitutional violation based only on "the mere fact that the misconduct occurred in the first place." *Id.* (internal citation omitted).

As noted, Plaintiff bases his failure to train allegations on deficiencies with respect to the medical needs of detainees.  Plaintiff has submitted evidence of the policy at issue, ECF No. 103, Ex. 7, its lack of direction regarding assessment of detainees' medical needs, and the testimony of several officers regarding a lack of understanding and implementation of that directive, ECF No. 102 at ¶¶ 70, 73—74 (citing Aborn Dep., ECF No. 103, Ex. 6 at 75—77; Jones Dep., ECF No. 103, Ex. 5 at 70—73, 86; Connolly Dep. 103, Ex. 3 at 104—06; Browning Dep. 103-3, Ex. 13 at 212—13; DeMaine Dep. 75-1[19] at 59, 60).

---

[19] As Plaintiff's refiled memorandum and Exhibits do not include the excerpts from Lt. DeMaine's Deposition, the court makes reference to the submission in connection with Plaintiff's original opposition papers.

The court concludes that construing the facts in his favor, Plaintiff has presented

sufficient evidence to create an issue of fact for the jury with respect to an alleged failure

to train.  The policy at issue provided that upon arrest, the officer who completed booking

was to "assess the current health of the detainee including . . . [l]ist[ing] any physical

deformities, including bruises, trauma marks, and ease of movement, on the Uniform

Arrest Report . . . ."  ECF No. 103-7, Gen. Ord. 221 at .11.24.  It further provided that

> The Desk Supervisor or his / her designee will be responsible for the supervision of prisoners. The Prisoner Log is used to help identify and account for all prisoners, cells assigned, criminal charges filed, bail amount, times checked, Bail Commission notification, phone calls, booking status, and notation of any special circumstances (medical, warrants, court set bond, family violence case, etc.).
>
> . . .
>
> A physical face-to-face check by the Desk Supervisor or his designee of each prisoner shall occur at least once every work shift, and documented on the Prisoner Log. Additional visual / audio checks of the prisoner cameras and audio monitors shall occur on an ongoing basis, at least every thirty (30) minutes, during the course of each shift that prisoner(s) are in custody.
>
> . . .
>
> Supervisors shall ensure that all personnel in their command are familiar with the content of this policy and are operating in compliance with it.

*Id.* at .11.21, .11.42, and .11.60.

Officer Aborn testified that he did not recall a requirement of face-to-face checks

of detainees, ECF No. 103, Ex. 6 at 75—76, that he did not believe he documented any

of his interactions with Mr. Feliciano while he was detained at the EHPD, *id.* at 76—77,

and that he did not believe he was responsible for video or audio checks of detainees at

the time of Mr. Feliciano's arrest, *id.* at 77.  Officer Jones testified that he had not

documented anything on a prisoner log, was not assigned to conduct face-to-face checks

of detainees kept overnight, was not trained with respect to documentation of such checks, and was not aware how often such checks were supposed to take place. ECF No. 103, Ex. 5 at 71—73, 86. Lt. Connolly acknowledged that section .11.42 regarding physical checks was in effect at the time of Mr. Feliciano's arrest and it required face-to-face checks to be documented on the prisoner log. ECF No. 103, Ex. 3 at 104. He further testified that he was not aware how such documentation was to be made as there was not a place on the log to document a physical check of the detainee. *Id.* at 105. He stated that he did not conduct any audio checks, nor designate that another officer do so, during the time he was on duty (while Mr. Feliciano was detained). *Id.* at 106—07. Sgt. Browning testified that the watch commander was not responsible for conducting audio checks every thirty minutes, despite the provisions of Gen. Ord. 221, sec. .11.42, but also that he was not trained on any such protocol. ECF No. 103-3, Ex. 13 at 212—13. Lt. DeMaine testified that it was the practice of the EHPD to occasionally view the monitors to check on detainees, but not at any specific interval. ECF No. 75—1 at 59. He testified that anything that was observed on the monitors was not documented in the prisoner log, unless the detainee was being destructive. *Id.* at 60.

In light of the lack of specific protocols for determining a detainee's need for medical treatment, and lack of training with respect thereto, along with testimony regarding officer and supervisor understanding that was inconsistent with stated observation and log documentation protocols, Plaintiff has submitted sufficient evidence to create an issue of fact for the jury as to whether inadequate training led to an unlawful denial of medial treatment in this case. It cannot be disputed that policymakers at the EHPD knew "to a moral certainty," *City of Canton,* 489 U.S. at 390 n.10, that officers

would be confronted with detainees in need of medical attention.  Further, in such circumstances proper training of EHPD officers would make a decision regarding such care "less difficult," *Walker*, 974 F.2d at 297, and Plaintiff has presented testimony regarding officers' lack of understanding and conduct inconsistent with governing policy. Finally, the failure to attend to a detainee's medical needs "will frequently cause the deprivation of a citizen's constitutional rights."  *Id.* at 298 (citing *City of Canton,* 489 U.S. at 390).

For the foregoing reasons, the defendants' Motion for Summary Judgement on Plaintiff's *Monell* claim is **DENIED.**

## IV.    CONCLUSION

Defendants' Motion for Summary Judgment, ECF No. 100, is **GRANTED IN PART AND DENIED IN PART.**  The Motion is **GRANTED** with respect to the claim in Count Four against the supervisory defendants.  The Motion is **DENIED** with respect to the claim seeking municipal liability in Count Five.  That claim, as well as the remaining claims contained in Counts One, Two, Three, and Six,[20] will proceed to trial.

The parties shall submit a Joint Status Report on or before **August 11, 2023,** indicating (1) how long they anticipate trial will take, (2) whether they are interested in an additional settlement conference with United States Magistrate Judge S. Dave Vatti; and (3) whether they consent to trial of this case before a randomly-assigned magistrate judge

---

[20] As noted, the Second Amended Complaint contains a scrivener's error in that it repeats "Count Three," and, therefore, the court refers to subsequent counts in sequential order rather than by the given number. In addition, although Defendants initially sought summary judgment with respect to the indemnification claim in Count Six, in their reply brief, Defendants withdrew their argument with respect to that claim.  ECF No. 104 at 8.

(other than Judge Vatti), as such consents may result in the jury trial being scheduled earlier than the case would otherwise be set down for trial.  After receipt of the parties' status report, the court will refer the case for another settlement conference (if requested), and will issue instructions and deadlines for the Joint Pretrial Memorandum and for all remaining pretrial motions.

**IT IS SO ORDERED** this 27th  day of July, 2023, at Hartford, Connecticut.

/s/
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE